My name is Mark Swillinger. I appear on behalf of Appellant DirectTV. It's a bit of an unusual case this morning for two reasons. One is there are no appellees. The defendants defaulted below and have not appeared on appeal. Their interests are being represented by the Electronic Frontier Foundation. It's also unusual because this case is about the meaning of two words, but the parties don't agree on which two words they are. We think this case is about the beginning of 47 U.S.C. 605E4, the statute at issue in this case, which makes it illegal to do seven things, to manufacture, sell, distribute, import, export, assemble, or modify devices knowing or having reason to know that those devices are primarily of assistance in the unauthorized decryption of direct-to-home satellite services like DirectTV offers. It doesn't say any person who assembles and modifies for commercial gain, and it doesn't say any person who assembles and modifies to assist others. What it says, and what the Fifth Circuit said it says in DirectTV v. Robeson, is the modification and assembly of pirate access devices is an offense whoever commits them. Now, below, the two district courts got the interpretation of 605E4 wrong. Judge Armstrong got it wrong in Oliver because she said DirectTV had to show that the defendants had sold or distributed devices, reading out completely the other five verbs I just mentioned and disregarding the 1988 amendments to the statute. Well, she might be wrong on that, but what about Judge Breyer's case? So Judge Breyer took a look at 605A, which is the statute that prohibits the unauthorized reception or watching of DirectTV signals, and 605E4 and said the defendants couldn't violate E4 if the only modification they did was what was necessary in order to watch. Judge Breyer made two mistakes. First of all, it is absolutely not a prerequisite that someone assembles or modifies a device in order to violate 605A and to watch DirectTV without authorization. I'll talk about that in greater detail in a minute. The legal error is that if someone does assemble and modify a device and then uses the both those statutes. Can I correct that what gets modified is this access card? You are correct. And then I'll start with the factual error. There are four things I want to cover. The factual error is a plain meaning of the statute, the 1988 amendments and the Rosenthal statute. The access card is something you're holding in your hand. I am. And an individual that subscribes to DirectTV's basic service pays $20 a month or whatever and has a card that authorizes just to receive basic service. Exactly. Or if they have pay-per-views or enhanced service, the access card is the key because this is what goes into the DirectTV receiver and you have a satellite dish on your room and the card unlocks the channels that you're paying to receive. And what this up looper, do I have the word right? Unlooper. Unlooper. This unlooper device enables someone to do is to, for example, take a card for basic service and adjust it so you put it back in the dish and you can receive every channel that DirectTV has without paying for it. Not exactly. The devices do that. The unlooper has a slightly different function, if I might. An individual who wants to pirate DirectTV has really two options to do so. At least at the time this offense took place. Right now there isn't piracy of DirectTV, fortunately. But you can get a pre-modified access card. You can buy from somebody who has used a device, a loader or a programmer, to program these access cards in order to unlock all the channels. A pirate can get one of these, stick it in their receiver and watch TV without paying for DirectTV service. Or you can do what the defendants did here. Buy a loader and an unlooper, two separate devices. And what those allow the defendant to do is put this into the loader or programmer and program it so that it can access all of DirectTV channels. DirectTV then detects that from time to time. They detect the use of an illegally programmed card and they send an electronic countermeasure to disable the card. Then the defendant takes that disabled or what's known as a looped card, puts it in an unlooper and restores the card back into a condition where they can then program it to watch DirectTV again for free. So the unlooper actually solves for DirectTV's electronic countermeasure and the programmer or loader allows them to program it in the first place. Some devices are a combination. Doesn't the person doing this have to have a dish and a receiver? Yes, absolutely. You have to have a dish and a receiver. In this case, there's been no, first of all they defaulted, but these were subscribers of DirectTV so they had a dish and a receiver and there's no claim below that they didn't have the necessary equipment to pirate. And the contention which they defaulted on was that they were upgrading, if you will, that access card. Yes, the claim was that they had actively programmed and reprogrammed these access cards in order to unlock DirectTV. DirectTV's not contending that the device in question is the dish, right? No. Or the receiver. Not in this case, no. But the card is altered. The device was the, they bought devices to alter the card and the modification that they did was the programming and the unlooping of these cards. Reprogramming through the unlooper? Is that what's going on? They're reprogramming the cards through the programmer that they purchased and the unlooper. The unlooper again allows them to continually reprogram the card. And correct me if I'm wrong, what's the issue before us is not the unlooper or the programmer, but that? Well, what's at issue is their actions of us modifying these cards. Let me ask the question this way. What's the device that DirectTV contends violates the statute? This is the device, the modification of which violates the statute, right? The statute is not violated by the possession of a device. Doesn't the statute require primarily? Yes. Yes, Your Honor. And can you say that that card is designed primarily for improper, unauthorized reception of signal? Once modified, absolutely. That is, there are a couple things at issue. They purchased the unlooper and the loader. Those devices are primarily designed. But they're not at issue here. Well, they are. The use of them to modify, this is an action case. That is, it's not a device case. It's an action case. The action is the action of modifying. And they took devices that are primarily designed for the modification. So the manufacture of those devices violates E-4. And they took those devices and used them to program these cards such that the cards became primarily a subscription to the unauthorized encryption of DirectTV access cards. They serve no other purpose. They didn't have a subscription. To Your Honor's point, if they had a subscription, I understand what you're saying, the cards serve two purposes. It allowed them to see what they're supposed to see and it allowed them to see what they're not supposed to see. But here, they canceled their subscription. The only function the modified and programmed card was serving was the function to allow access to DirectTV without paying. Now, did the courts below go primarily on the fact that this statute's not designed for end users or is it something else? I think, well, Judge Breyer went on the fact that there needed to be a dichotomy between 605A and 605E4 and found that 605E4 was not designed for individual users, the exact opposite of what the Fifth Circuit found. And what I think is, he's right, there is a dichotomy, but it's not the dichotomy he points out. The distinction is between those who make or distribute devices. That's an E-4 violation. And those who use devices, that's a 605A violation. And so there is a difference between the two forms of conduct, but it's the make or use. And what the defendants did here was they made a device. And why it makes sense that that would be punished differently is because that type of piracy is much more pernicious and robust than someone who just goes on the Internet, buys an access card, and sticks it into their receiver. That person is out of business as soon as DirectTV sends an electronic countermeasure to disable the card, right? But the person who has the device and the unlooper can not only make these devices for others, but when DirectTV disables their card, they can put it back in, reprogram it, and put it back into their machine and watch TV again. So Direct... I'm sorry. There's no evidence in this case that they used it for other than themselves, correct? There is no evidence that they used it, but they didn't appear. I mean, we didn't get it. We allege that they used the devices to program the cards. We didn't get a chance to discover. It's based upon your allegations, and the Court would grant a default judgment. That's correct. And we're not here today to say that this Court should base its opinion on that. We think that 605E4 is plainly clear that even if they modify their device for their own personal use, that is a violation of E4. That is different conduct by nature and design than just using a piracy device. They don't have to acquire the skills and the tools and cause DirectTV the hardship of reprogramming and reprogramming their cards to pirate. They could commit the simple violation of 605A by buying one of these modified cards, sticking it in and watching TV. That is a lesser offense that has a lesser scheme of punishment than what they did. How many circuits have ruled on this? Two. The Fourth Circuit and the Fifth Circuit. The Fourth Circuit in Pernides and the Fifth Circuit in two decisions. One was DirectTV v. Robeson and one was the Herald decision. And they said, both of those circuits said there is no manifest intent by Congress, no language in the statute, no statutory purpose, to limit 605E4 to those who do it for a commercial purpose. Has any circuit ruled to the contrary? No circuit has ruled to the contrary. There are some district courts that have, of course. There are. Yes, we have here. And the Fifth Circuit and Robeson rejected each and every district court case that the EFF relies on to support their argument. Not in theory, but by name. Doesn't Robeson say that individual users cannot be categorically excluded? It does say that. Does it take the next step? It doesn't. It does not take the next step of whether the modification of a card is, in fact, a violation of E4. It says it left that to the district court. But we have defaulting defendants here. That is, this is a different profile than Robeson. What I'd like to suggest to the Court is that even to get to these questions, we have to find an ambiguity in the language of the statute. Right? Their argument, the EFF's argument, is that there's some implied limitation for commercial purposes or implied limitation for to assist others. What I really want to direct this Court to, and this is important because it's not in the briefs, is the argument they're making that there's this implied limitation for commercial use or for assisting others, those terms are in 605 in different places. That is, it makes no sense to read those terms as impliedly in 605E4 when Congress wanted to condition something on private financial gain or commercial use, it did so. If you look at 47 U.S.C. 605E2 or you look at E3, Congress enhanced the penalties when somebody is acting for private financial gain or when someone is acting for commercial use. They did not do that in E4. If you look at 605A, there's a provision in 47605A that says if you assist others in unlawfully acquiring direct TV signals. That doesn't appear in E4. So not only do they want you to read these terms in, which aren't there, but they want you to read these terms in when they are in other places in the statute and Congress made a specific choice not to put them in E4. The other thing I want to talk about is they suggest that we should use this no-sheet or associus principle to interpret, assemble and modify the way the other words in the statute have some sort of a commercial component. I think that's absolutely the wrong thing to do. It's the wrong thing to do for three reasons. First, these words are listed in the disjunctive, not the conjunctive. And as this Court has said before, when words are in the disjunctive, they're intended to have a distinct and separate meaning. They're not supposed to be the same. Second, these words weren't all added at the same time. Assembly and modification and export were added in 1988. Manufacture, distribute and sale were added in 1984. So you wouldn't look to all those words to use that principle of statutory interpretation. It also contradicts the purpose of the 1988 amendments because in 1988 Congress wanted to give prosecutors and civil plaintiffs like Direct-TV additional legal tools to bring piracy under control. Congress found specifically that piracy was rampant among commercial users and among private home users. So they added the words assemble and modify to the statute. And if there were some sort of commercial connotation, you wouldn't need them. Assembly for commercial purposes is manufacturing. Modification for the purpose of helping others is distributing. Congress's amendment in 1988 would have been completely superfluous if you put these implied limitations on the word assemble and modify in 605E4. The indication is quite the contrary. Congress was trying to give civil plaintiffs more piracy tools, not fewer. Expand standing to sue, not narrow it. So I think their principle of statutory construction in addition to the fact that their lead case, Babbitt, is where the Supreme Court reversed the D.C. Circuit for using this principle has no place in this case. Now, so let me go to the Robeson decision, which is one where they claim, and I really would challenge the Electronic Computer Foundation to explain how Robeson could possibly be consistent with the district court's decision in this case. Because Robeson was faced with the question of whether there was an item in 605E4 that required some commercial component. And the Fifth Circuit said there absolutely wasn't, that there is no indication that Congress intended to condone any of these seven verbs that I mentioned before when they're engaged in by an individual user. So I'm interested in hearing that because I think the Fifth Circuit and the Fourth Circuit have really addressed this issue. When the Robeson panel sent it back to the district court, what did they expect the district court to do? Well, that's a difficult question to answer. I guess they expected the district court to determine whether there was modification of a device in the case. All they said was that it wasn't a categorical exclusion. Right. They said there was no categorical exclusion because there was no implied limitation on who could be an improper actor for purposes of E4. I wanted to make one other point and then save the rest of my time for here because they're concerned about the principles and the effect this case might have on legitimate scientists in the scientific community and researchers. And I think there is no real concern there. This statute has a knowledge requirement. You have to know or have reason to know that the device is primarily of assistance in the unauthorized decryption. This statute has another place where it says if you had no reason to know on a violation of 605A that you were doing something wrong, damages are reduced to $250. You can't just inadvertently create a device that's primarily of assistance in the decryption of DirecTV and have no reason to know you've done that. I mean, this doesn't affect the scientific community. This is a very narrow statute and as Judge Breyer said, unloopers are so specifically designed for DirecTV piracy, there's no concern that there'd be some other legitimate use for them. With that, I'd like to save the remaining four minutes for rebuttal. Okay. Counsel? Jason Schultz for Amicus Electronic Frontier Foundation. First, I'd like to clarify. We are not here to defend the conduct of the defendants in this case. We are really here just to provide our perspective on the law and how we think it should read. We have no issue with the finding of liability for 605A here against these defendants. What we're really concerned about is the definition and construction of 605E4 for two reasons. The first is that we don't believe that Congress meant to encompass as broad a spectrum of activity as DirecTV says here. We think that the penalty structure and the way in which the words were placed in the statute does reflect a conscious choice by Congress to define specific categories of behavior. In other words, what role you play in the satellite piracy scheme and decide penalties that are appropriate for that scheme. Second, and this is going to Counsel's point about security researchers, what we mean here in terms of the danger this poses to security researchers and computer scientists is there are researchers who study hacking devices, devices that intercept. In other words, there are scientists and researchers and consultants who look at unloopers. They want to study them to understand. It's like if you want to build a better mousetrap. You have to look at the old traps, see how the mouse gets out, so you can build a better one that might prevent the mouse from escaping. There are security researchers who look at these devices, prod them, poke them, experiment, test them, and if all it takes is a modification of one of these unloopers to make you liable civilly for $100,000, potentially, or criminally, even if you never  then that has a chilling effect, potentially, on these researchers and scientists. So as to the statutory argument, oh, and actually, let me address the knowledge issue for a second that Council raises. When these scientists or researchers take in a looper, if they know what it is, that qualifies. In other words, the knowledge standard is that you knew this device is primarily designed. So in that sense, if they know they're getting a device that DirecTV believes allows satellite interception and reception, they've satisfied the knowledge requirement. That doesn't get them off the hook there. As to the statutory interpretation, I... Just before you get to that, is there any evidence in this record or generally that DirecTV has gone after hacking researchers of any kind? So that's an excellent question, Your Honor. In terms of this record, no, but this record is obviously very slim because of the default of the defendants. But in actually, well, in this record and in other DirecTV cases, for instance, DirecTV's own experts. For instance, the DirecTV v. Little case. In that case, I believe in footnotes 3 and 4, the court actually references the experts DirecTV brought forward who are experts in the field of embedded systems and security. Now these are obviously people DirecTV has chosen, and so therefore one assumes gives permission to do the testing and the modification and potentially the assembly. But let's say you're a competitor, and you want to understand DirecTV's system a little better, and you want to hire someone to look at it, or you're just a general researcher at a university. I think those are examples of people. I know it's not in the record, but there are researchers. There's a man named Avi Rubin at Johns Hopkins. There's a man named Dan Wallach at Rice University who are people who do research in the area of security and in smart card technology, which is what the access card is. It's a smart card. So I can tell you there are real people doing real research in this area, and in fact in the record. I'm sorry. The question is, is there any evidence anywhere that DirecTV has attempted to use E4 against researchers? Not that we know, Your Honor. We're concerned about the broader implications. So as to the statutory construction argument, we have no issue with any person including an individual. I think that is exactly what the Robeson court addressed. I think any person could include an individual, could include a commercial entity. I think you have to look beyond those two words at the whole sentence in E4, which is what kind of people in terms of what behavior they are conducting. They are people who assemble, modify, manufacture. And those are the words that we believe are ambiguous. In other words, what does it mean to assemble or modify? And I think that a simple example is if you were to look at the word assemble, I could go to Ikea and I could buy something there, take it home, and I could assemble it. Or you could look at, say, Motel and their manufacturing facility. They are assembling things there. I think those are two qualitatively different kinds of activities, even though the same word could apply to them. The same exists with modification. I might, you know, go to my computer and modify an icon on the desktop so that it's a cartoon character. I might modify, you know, something by putting a sticker on it. Or I might go to a mechanic and have them modify my engine. And I think that there are two qualitatively distinct categories there. If you put that card in an unlooper, doesn't that modify the card that has already been kicked out? Yeah. I agree, Your Honor, that I don't want to contest. I mean, DIRECTV in this case presented some factual information to the district court, and I believe it's possible that it could qualify for some definition of modification. The question for me is what definition did Congress intend when they created this statute? In other words, did they intend potential modification, or did they really intend a certain category of behavior? And I think the penalty structures actually go straight to that question of what kind of modification they're talking about. And I think the penalty structures You're just going by the way the statute reads, per se. Right. The structure of the statute, the legislative history, and the penalty provisions, and also, I believe that the Nostitura-Sosis doctrine does apply here in terms of well, it all kind of works together. So you have 605A and 605E4, which are two separate statutory provisions. You have separate sets of penalties for them. And then in 605E4 is where Congress chose to put these words. They didn't put them in 605A, where they could have said receiving, assisting receiving, assembling to receive, modifying to receive. They could have put them there. They also could have created a new statutory section if they wanted. But no, Congress took the section which was already dealing with distributors and manufacturers and sellers and said, okay, these are two words that kind of fill out the potential activities that these kinds of actors could engage in. And, in fact, modification there is in fact very appropriate because in the Harrell case, actually the Fifth Circuit case that Robeson relies upon, in that case, what happened was an FBI agent, this is a cable box case, it's a little pre-satellite, but an FBI agent went to the defendant there and said I'd like you to modify these for me and I'll pay you these devices. In other words, that modification was very much a sort of commercial public transaction to facilitate other people's interceptions. And that's really the clear line that I want to draw here. I know counsel took issue with the word commercial, but really I think when you look at especially Judge Breyer's decision, what he's talking about here is the role you play, not that you're a person or not a person. And what we're talking about here, are you simply taking the minimum necessary steps to facilitate your own interception, essentially what 605A is targeting, or are you facilitating or assisting others, in other words, helping multiple people potentially intercept? And that's where the penalty structure really comes in. If you're just doing it for yourself, $10,000. If you're assisting other people on a broad scale, then $100,000 is potentially the penalty there. And I think that makes sense in terms of how Congress is looking at this. If you look at betting laws, these kinds of things, they often try and punish the sort of head of the organization or the sort of orchestrator more than the average sort of mule or person on the street who might be still committing a crime and gets a penalty, but the penalties are greater for people who are facilitating a greater harm. And I think that's exactly what Congress is going for. Counsel, is there any legislative history that would give us some light on this? Yes, Your Honor, there's some. Unfortunately, I think this is one of the statutes where it became sort of a Frankenstein in some ways where, you know, it was updated and Congress was sort of commenting on various things. A while ago, you said you were depending upon legislative history. You're not doing that now. No, no, I am. So I think I just, the history here is not as clear as I would hope. There were lots of general statements about we want to stop piracy. Everyone agrees. That's true about almost all legislation, right? There is one statement, though, the Packwood statement in 1984, and I will connect it to 1988 because I know that's when these words were inserted. In 1984, Senator Packwood made a statement, it's in the record in legislative history, about how that this law in general was meant to target those who receive and then those who assist, and then he specifically points out sellers and manufacturers. In other words, he drew specifically two categories of people. And so then you had 605A for the people who intercept and 605E4 for the people who are assisting by selling and manufacturing. Now, in 1988, there were general statements made about improving standing and upping penalties, and all that was done generally throughout the statute. So it's hard to associate certain legislative history in 1988 with particular provisions because they weren't addressed by name. But Congress kept the structure the same. In other words, the provisions that Senator Packwood was talking about that were to address assistance to other people, that's the provision that Congress inserted assembles and modification into. In other words, Congress chose to pick that provision as the place where these words would rest. And so, to the extent I think that informs what Congress was intending, they really meant that category of behavior is what they were trying to address. Now, you're basing the whole legislative history upon a statement made by Senator Packwood. How close to the time that it passed was this statement made? Your Honor, actually, I'm not sure how close it was to the 1984 amendments, but I know it was part of the official Senate report that went with the bill. So I assume that it was as much an authority as you can have in terms of what Congress was thinking at the time. But as we know, it's hard to ascertain. Was he the author of the bill? Was he? Actually, you know what? I'm not actually sure of the 84 amendments. I know that he was the chair of the committee, though, that was in charge of it. One other — oh, sorry, Your Honor, if you had a question. Oh. One other point as to the no-satura argument and the disjunctive argument that it shouldn't apply when there's an or. While that may be a general tenet, I think here it doesn't make any sense. Congress wouldn't say that you had to assemble, manufacture, sell, distribute, modify, and do — like, in other words, nobody would do all of those things. So the and there doesn't make any sense to me. So it had to be an or. It might have been an and slash or if Congress wanted to go that way. But I think here, like, that sort of thinking doesn't really apply to this particular statute because or is the only sensical way that Congress could have spelled this out in order to actually find anyone liable. Oh, I just wanted to make one comment also quickly about the Fourth Circuit case, the Pernice test case. It was actually an unpublished decision, which, according to the local rules of the Fourth Circuit, is non-precedential. So in terms of any concern about that case, I mean, it still persuades it potentially, but it doesn't add to the weight of potential conflicts. But as I said, I don't believe that Robson or Robeson is a conflict with the circuit. I believe it was addressing whether, as Your Honor points out, whether categorically you can exclude individuals. And we don't try and push that line here. We don't think if an individual does facilitate the interception of others, let's say they have their own home basement business where they are making and selling these devices or modifying them for people as they come in and pay them money, that I think would qualify. But what we're talking about here are the minimum necessary steps. And to clarify, and this was something that the courts below pointed to, Direct TV, part of their pleadings and part of the conclusion was that simply removing and inserting the card into the Direct TV box was an assembly. In other words, taking the access cards that Mr. Zoellinger had and sticking it in so that you can activate the box, that's an assembly. That is $100,000 potentially of extra damage. Ginsburg. Is it assembly or modification or both? Well, I'm trying to read their pleadings, and I believe that they say that it is an assembly and or modification. I think they actually take advantage of the and or distinction. That's a maximum penalty. That's not a minimum. That's not a floor. No. But if you look at the range, the range for actual interception, I believe, is 1,000 to 10,000. The range for E4 is 10,000 to 100,000. So, again, Congress is pretty clear that these are not even overlapping. They're really distinct penalties in terms of the kind of activities that one engages in, in this sort of problem area of satellite piracy. I think we have your argument down, Pat. Thanks. I'll reserve in case you have any further questions. We'll hear from DIRECTV. Why do you need both A and E4? We need A and E4 because A goes after the active interception, and people who modify and assemble don't always intercept themselves. Someone could be modifying devices in their house, and they could be distributing to others. But we also need it because people who are modifying for their own use cause DIRECTV so much more time and expenditure of time and effort than somebody who just sticks a card into their device. That is, we are not claiming that sticking a card into the device is a violation of E4. We're not. And we're also pointing out that it is not true that it's the minimum necessary steps to pirate DIRECTV to buy an unlooper and buy a loader and modify an access card. That's just not right. I've been litigating DIRECTV cases for six years. I've had 12 cases in front of Judge Pragerson. Many of them have been about people who just bought devices off the Internet. So you can just buy one of these cards, not now because there's no piracy, but back in 2000, and stick it into your receiver. That's the minimum necessary steps. That doesn't violate E4. This is more than minimum necessary. You're trying to promote that business, are you? Certainly not. Certainly not. In order to get to any of these statutory interpretation arguments, you've got to find an ambiguous word. None of these words are ambiguous. All of the examples on what modify means are to change or to alter. The only ones the EFF came up with in their brief was you could modify a policy position by making it less extreme or an adjective could modify a noun. We're not talking about a particle of speech. We're not talking about a policy position. We're talking about a device. It's so clear that in their own brief, the EFF on page 9 says the software has an interface that allows the user to easily modify the DIRECTV access card. They can't even use a better word in a brief where they're complaining that modify is ambiguous. There's no ambiguity here. And the reason that he can't cite legislative history is because all of the legislative history is in DIRECTV's favor. Congress wanted to do this. And what legislative history supports your position? It's the points where Congress said that piracy was rampant among both commercial users and home users, that Congress wanted to expand standing to sue and give civil litigants more tools to combat piracy. And we've been using these tools in order to combat piracy for the last six or seven years. The final point, well, I guess the second to last point, my penultimate point, is that this was a rational policy choice. That is, Congress could have made a different policy choice and said you have to, to violate E4, you have to assist others. To violate A is for, you know, your own use. That's not the choice they made. And they can go back and make that if this turns out to be a problem. It hasn't been, but they can go and fix it if that's what they wanted to do. But what the language they used was, was that it's one offense to make a device. For your own use or for anybody else's use, it's an offense to make a device and it's an offense to distribute the device. That's E4. And there's an offense to use a device, and that's 605A. That's the choice they made. And any discovery done in this case? There was an evidentiary hearing before Judge Breyer, the transcript of which was attached to our civil docketing statement. But since the other side didn't participate at all, there was no discovery other than that evidentiary hearing and the submission of affidavits. In terms of what these individual defendants, the ones who defaulted, did, is there anything in the record more than the allegations in the complaint? No. It's the allegations in the complaint. It's the allegations that appear in Count 3. It's that they actively programmed and reprogrammed DirecTV access cards and designed electronic systems for use in obtaining DirecTV programming. The last point is that there is no question that if you uphold these two district court decisions, you'll be creating a circuit split. This is just you'll be creating a circuit split with no plain words to support it, no legislative history to support it, and no basis to disagree with what the Fourth and Fifth Circuit did when they looked at the same issue. Okay. Thank you. Thank you both for your arguments. The case just argued will be submitted for decision. We'll proceed to the last case on the argument calendar, which is St. Paul Fire and Marine Insurance Co. v. Veditec International.
judges: B. Fletcher, Siler , Hawkins